UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

K. ERIN HOHMANN,

Plaintiff,

v.

SEYFARTH SHAW LLP,

Defendant.

Civil Action No. 1:18-cv-10027-LTS

## AMENDED COMPLAINT AND JURY DEMAND

### PARTIES

1.     K. Erin Hohmann ("Ms. Hohmann" or "plaintiff") is a resident of Massachusetts.  Ms. Hohmann worked full-time at the defendant Seyfarth Shaw LLP's Boston, Massachusetts office from 2007 until 2016 and was an employee as defined by M.G.L. c. 151B.

2.     Seyfarth Shaw LLP ("defendant" or "firm") is a law firm headquartered in Chicago, Illinois, and has multiple offices nationally and internationally.  Defendant is an employer as defined by M.G.L. c. 151B.  Defendant is a covered entity and an employer within the meaning of Title I of the ADA, 42 U.S.C. §§ 12111(2) and 12111(5), respectively.

### JURISDICTION

3.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, in that this action arises under federal law, the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101.  Venue is proper in this jurisdiction because the unlawful employment practices alleged herein took place in this judicial district.

## INTRODUCTION

4.  Plaintiff brings this complaint for disability discrimination, retaliation, harassment, and failure to accommodate.  Plaintiff was diagnosed with Crohn's disease in 2000 and worked for defendant as a contract employee from January through May 2007 and was hired in June 2007 as a regular full-time employee.  Crohn's disease is substantially limiting in the major life activities of eating and working (particularly when active), within the meaning of federal antidiscrimination laws.

5.  Upon commencement of employment as a regular full-time employee, it was determined that plaintiff would work remotely on Wednesdays to assist management of her chronic condition.  This arrangement came to be viewed by defendant as inconvenient and unnecessary.  In 2015, defendant requested for the first time that plaintiff submit a Reasonable Accommodation Form, which plaintiff promptly provided.

6.  On October 7, 2016, plaintiff was preemptively terminated for a pretextual reason.  The reason given to plaintiff was for a practice that occurs regularly in the firm's billing departments.  Others are not terminated for this practice.

7.  The specific reason given for plaintiff's termination was that a billing issue had "escalated to the CFO."  Plaintiff was not told who made the termination decision.  Billing issues regularly escalate to the CFO, and the billing issue referenced had been rectified by the plaintiff weeks earlier.  Defendant's minimal due diligence in investigating the circumstances of plaintiff's termination has caused her significant emotional, physical and mental distress, damaged her reputation, and has impeded her ability to obtain equitable employment.

8.  Plaintiff had an exemplary work history with the firm, with no performance or disciplinary issues whatsoever.  She is ethical, knowledgeable, competent, responsible,

and was rated as "exceeds" expectations year after year. She delivered high-quality service to the firm, the attorneys she supported, and their clients. Copies of plaintiff's yearly performance evaluations are attached here as **Exhibit A**.

9.    Plaintiff received annual merit increases and bonuses, attained Six Sigma Greenbelt status and was, for a time, the Boston office billing team co-leader. Despite her medical illness being chronic with intermittent exacerbations over the years, her job performance and dedication never wavered.

10.    Plaintiff was fired approximately two weeks after she informed defendant that her illness was no longer in remission and shortly after she had discussed the retaliatory and hostile treatment toward her with defendant's Boston office human resources manager who is also the Boston office's billing department supervisor.

11.    Additionally, a few months prior to her termination, plaintiff had raised the issue in a department meeting that Boston office employees did not have a safe venue in which to bring concerns of retaliatory or other unfair treatment.

12.    Plaintiff's termination occurred on the morning that she was to submit her second yearly ADA medical accommodation form as requested. Plaintiff intended at that time to discuss potential disability and/or FMLA leave as her doctor had advised, and/or other possible solutions to minimize impact on her colleagues. Plaintiff's deteriorating health was patently obvious at the time, and many of her co-workers were concerned and anticipated her need for medical leave.

13.    From approximately 2013 through her termination in 2016, plaintiff made numerous requests to her superiors for full access to a tool that others could utilize. The increasingly burdensome workload was causing undue stress and anxiety, exacerbating her illness. Plaintiff was denied such access without explanation and no discussion of

alternatives that could help her manage her workload and, in turn – her illness – was ever initiated.

## BACKGROUND

14.    As a billing coordinator, plaintiff supported a diverse group of attorneys' practices, many of whose clients had complex billing requirements. Plaintiff's portfolio of billing clients included those of the intellectual property ("IP") practice group chair, Brian Michaelis ("Mr. Michaelis").

15.    At direct issue in this case is the process for the accurate billing for filings with the United States Patent and Trademark Office ("USPTO") and international patent prosecution handled by foreign associates contracted by the IP group, which requires that these costs be billed on the same invoice as the corresponding time worked.

16.    As documented in her 2008 performance review, plaintiff raised a concern regarding the firm's internal process with Mr. Michaelis, as the process did not ensure accurate reconciliation within the normal billing cycle. He agreed that it was a "VERY serious problem" as it also created ill will with clients and loss of revenue to the firm when not billed properly, as noted in same evaluation.

17.    The firm never addressed or resolved this process problem, and for the next eight years, plaintiff, herself, ensured that accurate IP invoices were sent to clients, i.e., following up on vendor costs, aligning costs with time worked, and finalizing invoices when USPTO and other vendor costs were captured in the firm's billing system.

18.    This process problem eventually culminated into the situation that the firm used as an excuse to preemptively fire Ms. Hohmann and was cast by the firm as a failure by her alone. Defendant's preemptive strike eliminated the chance that plaintiff might assert

claims and/or seek FMLA or disability leave, and deflected defendant's culpability for
plaintiff's rapidly declining health.

19.   In approximately 2012, the firm began transitioning to the use of a clearinghouse
electronic billing system known as the eBilling HUB ("HUB") as the legal industry and
many of the firm's clients were quickly migrating to an electronic billing platform for
processing invoices.  Plaintiff was informed by the Boston office administrator that when
the HUB was rolled out, plaintiff would have full access.

20.   During her tenure, plaintiff was never issued full access, despite her many requests.
Several of her peers – including those who were hired after the HUB was implemented –
were granted full access.  Not all the billing coordinators needed and/or requested partial
or full access to this tool, but plaintiff's portfolio of clients included many with complex
requirements that warranted this need.

21.   The lack of HUB resources presented barriers and created unnecessary obstacles and
redundancy of some of plaintiff's job duties, directly contributing to an increasing
backlog of work.  Although not the sole reason for the work overload, full access to the
HUB would have alleviated it.

22.   Plaintiff continued to perform her duties as she had prior to HUB implementation, with
the additional burden of preparing electronic billing – without electronic access.  Others
in her department did not have this extra burden.  Other inefficient practices by the firm
also contributed to the onerous workload.  Plaintiff raised these issues with her
supervisors and team members at various times over the years, but such practices
continued.

23.   On several occasions in the immediate months prior to plaintiff's termination, she
informed her supervisors that her workload was becoming unmanageable for one person

and was adversely impacting her health.  Others in her department were also aware of this.  However, the firm – despite its large labor and employment practice as it touted in its response to plaintiff's prior complaint – did not consider that Ms. Hohmann needed and should have full access to the HUB as an accommodation, although Ms. Hohmann told her supervisor(s) the access would help her to manage the workload and the resulting anxiety that was making her sick.

24.   Plaintiff would have been granted the same access as her peers had if the firm recognized it as an accommodation.  The defendant's consistent refusal of full HUB access without explanation was distressing and also embarrassing to plaintiff.

25.   The impediments created by lack of access to the HUB caused the situation that the defendant seized as an opportunity to preemptively terminate plaintiff's employment and was a guise to conceal discriminatory, retaliatory and punitive reasons.  The billing practice for which plaintiff was told she was terminated occurs regularly throughout the firm's billing departments and others are not terminated for it.

26.   As noted above, plaintiff continued to intermittently request full access and continued to provide supporting examples to her superiors.  An email exchange between Ms. Hohmann and the firm's CFO is attached as **Exhibit B** as an example of continued denial without explanation.

27.   Defendant's ambiguous language when delivering the termination blow – that a billing issue had "escalated to the CFO" – in itself is not cause for termination of other billing coordinators, and it is not cause for the plaintiff's termination, despite the picture the defendant tries to paint.

28.   Misrepresentations about plaintiff and even the recitation of an unlawful billing practice – to apply overpayments by clients to "future invoices" – were conveyed to the firm's

6

employment counsel in preparation of the firm's written response to Ms. Hohmann's prior complaint. Plaintiff had resolved the billing issue by the proper action of returning the overpayment to the client. Billing coordinators regularly returned overpayments and/or wired funds to clients for overpayments without informing billing supervisors and/or attorneys. These employees were not disciplined or subject to termination.

29. The Boston office human resource manager/billing supervisor – also present at the termination – knew that plaintiff had resolved the billing issue weeks before but acted as the catalyst in escalating the situation to the CFO. The Boston office human resource manager/billing supervisor neither said nor did anything to clarify or support the facts as presented to her previously by the plaintiff.

30. In the spring of 2016, during a team department meeting, plaintiff raised the issue that employees in the Boston office did not have a safe venue in which to bring concerns of discrimination/hostile work environment/harassment or other unfair treatment issues. In or around June 2016, the Boston office designated a new office EEO contact.

31. Defendant took no action to ensure that plaintiff could perform her job duties without undue hardship and did not prevent but instead supported or participated in the pretextual termination reason and disparate treatment of plaintiff.

32. The billing issue that "escalated to the CFO" occurred on plaintiff's remote workday, the Boston office human resource manager became involved and caused a commonly occurring situation to become a complicated situation, inferring that plaintiff had done something egregious.

33. The defendant engaged in and allowed retaliatory, discriminatory and punitive treatment of plaintiff, including but not limited to: (i) refusing to accommodate plaintiff's disability by alleviating unnecessary hardship in performing her job, i.e., HUB access; (ii) failing to

provide any reason(s) for denial of such an accommodation; (iii) not initiating or

engaging in dialogue or other communications with plaintiff to identify and/or

acknowledge potential interventions or solutions to reduce unnecessary stressors; (iv)

interfering with her ability to competently handle and resolve the common occurrence

that arose on her remote workday; (v) creating a false narrative of events and damaging

her reputation; and (vi) imposing unrealistic restrictions on billing coordinators' time-off

during a normal billing month, making the firm's generous time-off policy extremely

limited and difficult for the Boston office billing coordinators during plaintiff's tenure.

34.    In the weeks before her termination, plaintiff expressed separately to the Boston office

human resources manager that the hostile work environment and excessive workload

were exacerbating her illness, and that she was reaching a limit that would require her to

remove herself from such a situation by the end of the year. The human resources

manager suggested that a portion of plaintiff's work be distributed to billers outside the

Boston office. This would require detailed instruction and/or historical knowledge,

defeating its purpose. Plaintiff was capable of handling the job herself had she been

given the tool to do so.

35.    On October 7, 2016, plaintiff was surreptitiously terminated by the Boston office

administrator, completely surprising her, her team members and many other colleagues.

None of the attorneys with whom plaintiff worked closely were notified of her

termination until the following week. At least four of plaintiff's primary attorneys who

depended on her for their related practice management were not in the office that day.

36.    Plaintiff was not briefed about the continuation of benefits or other pertinent information

during the termination. Instead, the Boston office human resources manager told plaintiff

that they could "talk next week" if plaintiff had any questions. Plaintiff was unaware that

8

her health insurance was terminated that day, and in the midst of her known active illness, it was not unreasonable to expect that it would have been mentioned before her departure.

37.   The decision to abruptly terminate as the only course of action eliminated the possibility of a smooth transfer of work and was not in the firm's or its clients' best interests.  The firm was responsible to the partnership and, in particular, to the attorneys supported by the plaintiff, to ensure the successful transfer of her client billing accounts.  Year-end closing preparations were in motion and the repercussions to the attorneys she supported, and their clients, greatly concerned plaintiff in the following months.  If the reason given for the termination were true, such emergent action was not required – it does not make sense.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

Pursuant to the state and federal law requirements, and 42 U.S.C. § 2000e-5, plaintiff has exhausted her administrative filing requirements by filing timely charges with the Equal Employment Opportunity Commission and the Massachusetts Commission Against Discrimination and received a Right to Sue Notice on October 17, 2017, attached here as **Exhibit C**.

## COUNT I – DISCRIMINATION IN EMPLOYMENT:  DISABILITY
### Americans with Disabilities Act of 1990 (42 U.S.C. § 12112) and M.G.L. c. 151B (4)(16)

38.   Plaintiff restates and incorporates by reference the allegations set forth above in Paragraphs 1 through 37 and restates the same allegations herein.

39.   Plaintiff is a member of a protected class as she is a person with a disability.

40.   Defendant took an adverse employment action against her by terminating her when employees who do not suffer from the same disability received no adverse employment action for the same conduct.

41. Defendant's conduct, as set forth above, constitutes unlawful discrimination on the basis of disability in violation of M.G.L. c. 151B (4)(16) and 42 U.S.C. § 12112.

## COUNT II – RETALIATION FOR ASSERTION OF RIGHTS
### Americans with Disabilities Act of 1990 (42 U.S.C. § 12203) and M.G.L. c. 151B (4)(4)

42. Plaintiff restates and incorporates by reference the allegations set forth above in Paragraphs 1 through 41 and restates the same allegations herein.

43. Defendant unlawfully retaliated against plaintiff in violation of M.G.L. c. 151B (4)(4) and 42 U.S.C. § 12203.

## COUNT III – INTERFERENCE, COERCION, INTIMIDATION
### Americans with Disabilities Act of 1990 (42 U.S.C. § 12203) and M.G.L. c. 151B (4)(4)

44. Plaintiff restates and incorporates by reference the allegations set forth above in Paragraphs 1 through 43 and restates the same allegations herein.

45. Defendant unlawfully interfered, coerced, and intimidated plaintiff in violation of M.G.L. c. 151B (4)(4) and 42 U.S.C. § 12203.

## COUNT IV – FAILURE TO ACCOMMODATE
### Americans with Disabilities Act of 1990 (42 U.S.C. § 12112) and M.G.L. c. 151B (4)(16)

46. Plaintiff restates and incorporates by reference the allegations set forth above in Paragraphs 1 through 45 and restates the same allegations herein.

47. Defendant failed to accommodate in violation of M.G.L. c. 151B (4)(16) and 42 U.S.C. § 12112.

WHEREFORE, plaintiff respectfully requests that this Court order the defendant to award the following relief:

1.   Back pay;

2.   Front pay;

3.   Lost benefits, including contributions to 401(k) plan and bonuses;

4.   Emotional, physical and mental distress damages;

5.   Punitive damages;

6.   Attorney's fees and costs;

7.   Pre and post judgment interest; and

8.   Any other relief to which plaintiff may be entitled.

<u>JURY DEMAND</u>

Plaintiff hereby demands a trial by jury on all her claims.


                          Respectfully submitted,

                          Plaintiff, *pro se litigant*

                          K. Erin Hohmann
                          171 Salem Street
                          Lynnfield, MA  01940
                          P: (978) 317-2476
Dated:  November 1, 2018  kerinhohmann@gmail.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 1, 2018, I filed the foregoing with the Clerk of the Court, and service on all counsel of record is being made through the Court's CM/ECF system.


K. Erin Hohmann
Plaintiff, *Pro se litigant*